IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

BOSTON LASER, INC.,

                        Plaintiff,

                                       Civ. Action No.
                                       3:07-CV-0791 (TJM/DEP)

     vs.

QINXIN ZU and QPC LASERS, INC.,

                        Defendants.

_____

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFF:

ASWAD & INGRAHAM         CHARLES O. INGRAHAM, ESQ.
46 Front Street
Binghamton, New York 13905

FOR DEFENDANTS:

DREIER, LLP                IRA S. SACKS, ESQ.
499 Park Avenue            ROBERT J. GRAND, ESQ.
New York, New York 10022

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

     As many courts have observed, the issuance of a preliminary

injunction is an extraordinary and harsh action, the measure having aptly

been described as "one of the most drastic tools in the arsenal of judicial

remedies[;]" for this reason, such relief should be granted sparingly, and only as required to avoid irreparable harm to a party seeking such relief. *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979, 2007 WL 950092, at *2 (S.D.N.Y.  Mar. 28, 2007) (citing *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) and *Hanson Trust PLC v. SCM Corp*, 774 F.2d 47, 60 (2d Cir. 1985)) (internal quotations omitted).  By the same token, it has also been noted that the "loss of trade secrets cannot be measured in money damages" since "[a] trade secret once lost is, of course, lost forever."  *Norbrook Lab. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 482 (N.D.N.Y. 2003) (Munson, S.J.) (citing *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) and *FMC Corp. v. Taiwan Tainan Giant Indus. Co., LTD*., 730 F.2d 61, 63 (2d Cir. 1984)) (internal quotations omitted).  Like most restrictive covenant enforcement actions, this case lies at the intersection of these two well-established precepts.

Presently pending before the court is a motion by plaintiff Boston Laser, Inc. ("BLI") for a preliminary injunction which, it is argued, would effectively prohibit defendant Qinxin Zu ("Zu"), a former BLI employee, from earning a living in his chosen profession for one year anywhere in the

United States.  Applying the particularly well-defined test applicable to

such motions within this circuit to the evidence adduced in support of and

in opposition to plaintiff's motion, I find that BLI has fallen short of

sustaining its heavy burden of demonstrating entitlement to the requested

preliminary injunction, and I therefore recommend that plaintiff's motion be

denied.

I.      BACKGROUND

        Plaintiff BLI is a Delaware Corporation formed in 1999 principally for

the purpose of acquiring the assets, including patents, proprietary know-

how, and trade secrets, of the Semi-Conductor Laser Division of the

Polaroid Corporation, which operated in Norwood, Massachusetts.

Following the closing of that transaction in or about April of 2000, BLI

operated for a period of time in the Boston, Massachusetts area.

        In 2003, BLI purchased the assets of the Semiconductor Laser

International Corporation, a bankrupt company located in the Town of

Kirkwood, Broome County, New York.  Upon that acquisition, BLI moved

its operations to the Binghamton, New York area, utilizing the physical

plant obtained from the failed company, with the hope of decreasing

expenses and improving its manufacturing efficiency.  At the time of the

3

move, BLI also diversified its product lines.  The company is currently engaged in the manufacture of high-power laser diodes and subsystems, including laser markers and laser fiber coupling products, for military uses and other applications.  Included among BLI's customers are Lockheed Martin Corporation, Northrop Grumman Corporation, Raytheon Company, and Rafael Armament Development Authority Ltd.

Over time, BLI has had as many as thirty employees, although there are now only fifteen or sixteen people working with the company.  Among those employed by BLI at its inception was defendant Zu, a former Polaroid laser division employee who began working with that company in 1997.  Following the BLI acquisition of Polaroid's laser division, defendant Zu worked for BLI as a senior optical engineer.

When BLI announced plans to move its operations in or about March of 2003 to the Binghamton area, Zu declined the company's offer to relocate, deciding instead to resign from his position.[1]  Two months later, however, having been unsuccessful in finding suitable employment elsewhere in the Boston, Massachusetts area, Zu contacted officials at

---

[1]      Zu attributes his decision not only to the fact of the relocation, but additionally to a perceived lack of job security and the company's treatment of his wife, also at one time an employee of BLI.

4

BLI to express an interest in relocating to the company's Binghamton, New York facility.  BLI responded by offering to re-employ Zu, conditioned upon his willingness to sign an agreement regarding confidentiality and non-competition which, according to the plaintiff, is typical of agreements signed by all BLI employees.  Plaintiff agreed, and on or about May 5, 2003 executed a document entitled "Boston Laser, Inc. – Employee Agreement Regarding Inventions, Confidentiality, and Non-Competition".[2]

The agreement signed by Zu, which according to BLI's President and Chief Executive Officer ("CEO"), Aharon Meytahl, was derived from a similar contract formerly utilized by Polaroid, included several restrictive provisions.  Under the pact, Zu promised that during the term of his employment with BLI, and for one year following its termination, he would not directly or indirectly become employed by or enter into any arrangement with an entity or business in competition with BLI anywhere within the United States.  *See* Agreement § 7(a).  In the agreement, Zu acknowledged that this restriction against competition was for the protection of BLI's interests and its proprietary information, and that it was

---

[2]    That agreement, which is at the heart of this controversy, appears at several different locations in the record, including as an attachment to plaintiff's complaint.  *See* Complaint (Dkt. No. 1) Exh. A.  The agreement will be cited throughout this report and recommendation as "Agreement § ___."

"reasonable and appropriate for [that] purpose." *Id.* § 7.  The agreement

also provided that Zu would maintain the confidentiality of any proprietary

information gained while employed by BLI, and that he would not disclose

any such confidential information to any third party without prior written

consent of BLI, either during or following the termination of his

employment.[3]  *Id.* § 3.  The agreement further required Zu to return all

documents and records furnished to him by BLI immediately upon

termination of his employment, and included his concurrence that those

materials were the property of the company, additionally prohibiting him

from taking any such records with him upon leaving the company's

employ.  *Id.* § 4.  Significantly, the contract also provided that in the event

---

[3]        The agreement defines proprietary information to include, *inter alia*,

> all information, which the Company possesses or to which
> the Company has rights, which has commercial value.
> Proprietary Information includes, by way of example but
> without limitation, trade secrets, products, ideas, designs,
> configurations, processes, techniques, . . . know-how . . . [.]
> Proprietary Information includes information developed by
> me to be used in the business of the Company, whether
> before or in the course of my employment by the Company
> or otherwise relating to Inventions which belong to the
> Company under Section 5 below, as well as other
> information to which I may have access in connection with
> my employment.

Agreement § 1(a).  Such restrictions on an employee's use and dissemination of
confidential information are valid and enforceable under New York law.  *See BDO
Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 857 (1999).

6

of a violation of these covenants, the entry of an injunction, as well as any other available equitable relief, would be appropriate in order to restrain such a breach.  *Id.* § 8.

Upon his execution of the agreement defendant was re-employed by BLI as a senior optical engineer.[4]  In that position defendant Zu reported directly to President and CEO Meytahl, but did not himself supervise any employees.  While at BLI Zu received a salary which, in the year immediately prior to his departure from the company, approximated $80,000 per year, as well as a benefits package which included contributions into a 401-K plan, accrued vacation time, and medical insurance.  The only BLI employee with a higher salary was President and CEO Meytahl, although two other employees of the company were compensated at a level equivalent to Zu.

While not described in detail at the hearing, Zu's job duties at BLI generally included involvement in the development, design and production

---

[4]      The record now before the court reflects no consensus reached regarding defendant Zu's precise title at BLI.  The confidentiality agreement signed upon his return to BLI in 2003 references his title as simply  "engineer."  *See* Agreement at p. 1.  During the recent evidentiary hearing, BLI President and CEO Meytahl characterized plaintiff's position as that of "a senior scientist," although in his affidavit he lists Zu's title as "senior optical engineer."  Meytahl Aff. (Dkt. No. 1) ¶ 11.  In his testimony, Zu referred to his position at BLI as that of an "optical engineer"; he acknowledged, however, that at his initiative BLI had business cards printed identifying him as a "senior scientist."  *See* Exhibit P-3.

of products for the defense industry and other applications, including

airborne laser markers and the micro-lensing of semi-conductor lasers.  In

his position, although Zu was not involved in the production of chips or

laser diodes at BLI, he was engaged affixing lenses, generally acquired

from outside sources, to laser emitters, and became exposed to

technology and techniques involved in laser fiber coupling.  In his position,

plaintiff was invited to and often attended weekly BLI production meetings,

during which ongoing company projects were discussed.

In June of 2007, Zu was scheduled to take a vacation.  On the

business day prior to the commencement of his vacation, Zu telephoned a

BLI employee and informed her that he was not feeling well and had

therefore decided not to come to work on that day.

On the Saturday before he was scheduled to return to work from

vacation, Zu telephoned Jan McCauley, a BLI employee, and informed her

that he was contemplating an extension of his vacation.  Zu was directed

by Ms. McCauley to contact Meytahl on the following Monday, the next

work day, to discuss whether such an extension would be acceptable.

When Zu neither appeared for work on that Monday nor contacted

Meytahl or anyone else at BLI, company officials became concerned,

eventually learning, through a variety of means, that Zu had moved to Sylmar, California and became employed by defendant QPC Lasers, Inc. ("QPC").[5]  Subsequent efforts by BLI to contact Zu, both by telephone and by letter addressed to Zu's new California address, were unsuccessful.[6]

QPC is a publically traded corporation which was formed by Jeffrey Ungar, its President and CEO.  QPC and its wholly owned subsidiary, Quintessence Photonics Corporation, both of which are located in Sylmar, California, produce high power and high brightness laser diodes and related products for military and other uses.  QPC's laser products consist principally of high performance, multi-emitter and multi-mode lasers, some of which incorporate fiber coupling technology.  Like BLI, QPC markets many products with military applications, enjoying a close business relationship with various United States defense agencies, including the Defense Advanced Research Projects Agency ("DARPA"), a centralized

_____

[5]  Defendant Zu was tracked down at QPC through examination of records associated with his business telephone at BLI, and with the assistance of a private investigator.  While individuals contacted directly by BLI at QPC initially demurred when asked if Zu was working there, a call placed by BLI to Zu utilizing the main QPC telephone number was properly forwarded to a telephone extension at QPC assigned to him.

[6]  While BLI attaches great significance to the lack of notice provided by Zu upon the termination of his employment there, his agreement with BLI specifically provides that the parties' relationship may be terminated without notice.  *See* Agreement § 2(b).

organization engaged in research and development on behalf of the Department of Defense.  In describing his company Ungar, who possesses a Ph.D degree from the California Institute of Technology in Physics, differentiates between QPC and BLI by noting while BLI produces lower output industry standard lasers, QPC manufactures multi-mode lasers with significantly more power than BLI products of comparable beam size and color.  Typical applications for QPC products include use in connection with endoscopic varicose vein removal and long range military laser targeting.

Zu was located as a potential candidate for an open position within QPC by a recruiter retained by the company for that purpose.  Zu was ultimately hired by QPC following an initial, telephone interview with Ungar and a later, in-person interview in California conducted by one of Ungar's colleagues.  At no time during either of those interviews did Zu disclose the existence of his agreement with BLI nor, according to QPC officials, did they inquire as to whether he was under any contractual restriction limiting his ability to work at QPC.  Similarly, according to QPC, defendant Zu was not asked about his job duties or experiences at BLI during either

of those interviews.[7]

On June 11, 2007, upon becoming employed with QPC, Zu executed a comprehensive agreement entitled "Employee Confidential Information and Inventions Agreement", limiting his ability to utilize confidential and trade secret information acquired from QPC following the termination of his employment with the company.  Zu Aff. (Dkt. No. 13) Exh. A.  Under that agreement, *inter alia*, Zu also promised not to utilize any confidential and trade secret information obtained from other sources, including prior employment, in connection with his employment with QPC.[8] *Id.* Exh. § 5.

At QPC, Zu has been given the title of senior manufacturing engineer, and is earning a salary of approximately $83,000 per year.  In that position, Zu oversees certain of the steps utilized to manufacture laser bar fiber coupling modules, including affixing BTS and SAC lenses to laser bars, comprised of multiple laser emitters of varying power and wave lengths.  While Zu's duties at QPC involve oversight of fiber coupling

---

[7]    I do not accept this portion of Ungar's testimony, which on its face is simply not credible.

[8]    Zu has specifically denied having taken any confidential information from BLI with him when transitioning to the employ of QPC.  *See* Zu Aff. (Dkt. No. 13) ¶ 3.

performed by technicians, it does not include the design or manufacture of laser diodes or chips.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action in New York State Supreme Court, Broome County on or about July 20, 2007, naming both Zu and QPC as defendants.  Dkt. No. 1.  In its complaint, BLI asserts four causes of action, the first and third of which seek injunctive relief against defendants Zu and QPC, respectively, with parallel damage claims lodged against those defendants in the second and fourth denominated claims.  While the precise legal bases of plaintiff's claims are somewhat difficult to discern, they appear to center upon the agreement between Zu and BLI and the contention that through his actions, Zu has breached that agreement.  Simultaneous with the filing of suit, by order to show cause signed by Supreme Court Philip R. Rumsey on July 23, 2007, BLI sought a preliminary injunction precluding Zu from violating the terms of his agreement with BLI, and specifically enjoining his employment with QPC for a period of one year.  Dkt. No. 1.

On August 2, 2007 defendants removed the action to this court, asserting diversity of citizenship as a basis for federal subject matter

12

jurisdiction.  Dkt. No. 1.  At the court's direction, plaintiff thereafter refiled

its motion for a preliminary injunction.  Dkt. No. 6.  Following extensive

briefing and the submission of evidentiary materials, *see* Dkt. Nos. 11-17,

19, on August 29, 2007 Senior District Judge Thomas J. McAvoy issued a

decision and order addressing plaintiff's preliminary injunction motion.

Dkt. No. 21.  In that decision, Judge McAvoy began with a threshold

determination that despite the parties' agreement otherwise, the contract

between BLI and Zu should be interpreted pursuant to New York law,

employing the forum state's choice of law principles and rejecting

defendants' argument that California law, under which restrictive

covenants such as that now at issue are void as against public policy,

should apply.[9]  *Id*. at 6-10.  Turning to the merits of BLI's motion, and after

reciting the applicable standard, Judge McAvoy next determined that

plaintiff's motion could not be decided on the papers before the court,

ruling instead that an evidentiary hearing was necessary in order to flesh

out disputed factual issues bearing upon both the question of likelihood of

success on the merits and plaintiff's claim of irreparable harm.  *Id*. at 10-

---

[9]      The agreement between Zu and BLI contains a provision to the effect that
it "is made in and shall be construed under and governed in all respects by the laws of
the Commonwealth of Massachusetts without regard to its conflict of law principles."
Agreement § 10.

14.   The matter accordingly was referred to me for the purpose of conducting the required evidentiary hearing.  *Id.* at p. 14.  A hearing was subsequently held on September 11, 2007, during which testimony was elicited from BLI President and CEO Meytahl, QPC President and CEO Jeffrey Ungar, and defendant Zu.

III.   DISCUSSION

   A.   Preliminary Injunction Standard

   While the causes of action asserted by the plaintiff in this action arise under state law, the question of plaintiff's entitlement to the injunctive relief now sought is governed by federal principles.  *See Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987) (in diversity actions, the question of whether a preliminary injunction should be granted is generally one of federal law); *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1141 (3d Cir. 1977) ("Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions.").  Because such an order affords only temporary relief, there is no danger that the issuance of a

14

preliminary injunction in a federal case such as this, involving only state

law claims, will seriously interfere with the goals or policies associated

with the state-created right at issue, and which will ultimately be

adjudicated in accordance with state substantive law.  11A Charles Alan

Wright, *et al.*, Federal Practice and Procedure § 2943 (2d ed. 1995).

The prevailing test in this circuit for the granting of a preliminary

injunction, while often difficult to apply, is readily articulated.  To merit

such relief, a party must establish both 1) a likelihood that it will

experience irreparable harm in the absence of such interim relief, and 2)

either a likelihood of success on the merits, or the existence of sufficiently

serious questions going to the merits to make them fair ground for

litigation and, additionally, that the balance of comparative hardships tips

decidedly in its favor.  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, ___F. 3d

__, 2007 WL 2263932, at *5 (2d Cir. Aug. 9, 2007); *Federal Express Corp.

v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *Otokoyama

Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999);

*Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d

Cir. 1997); *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d

Cir. 1995) (citing *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d

Cir. 1991)).  The burden of establishing entitlement to injunctive relief, in accordance with this standard, rests with the moving party.  *Technical Publ'g Co., div. of Dun-Donnelley Publ'g Corp. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *see also*, *e.g.*, *Capital Servs. of New York, Inc. v. E-Poxy Indus., Inc.*, 196 F.R.D. 11, 12 (N.D.N.Y. 2000) (Kahn, J.).

Superimposed upon this test is a principle which, in light of the circumstances now presented, significantly heightens the benchmark for entitlement to the injunctive relief sought.  As Judge McAvoy noted in his earlier decision in this action, when a mandatory injunction is sought which, if granted, would alter the status quo or provide the moving party with substantially all of the relief sought in the action, that party must make a "clear" or "substantial" showing of likelihood of success on the merits in order to qualify for such relief.  *See* Decision and Order dated 8/29/07 (Dkt. No. 21) at 5 (citing *New York Magazine v. Metropolitan Trans. Auth.*, 136 F.3d 123, 127 (2d Cir.), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68 (1998), *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) and *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).

16

B.    Likelihood Of Success On The Merits

The key contract provision now in issue is a clause which imposes a one year restriction on defendant Zu's involvement with "any business activity anywhere in the United States which develops, manufactures or markets products or performs services which are directly or indirectly competitive with the products or services of [BLI]" for a period of one year. Agreement § 7(a).  While vigorously contesting plaintiff's assertion that BLI and QPC are competitors, defendants acknowledge that in the event the court finds that they in fact do compete then this provision, if enforceable, has been breached by virtue of his affiliation with QPC.  Defendants argue, however, that in any event the agreement signed by Zu, including notably its limitation on re-employment, is unenforceable.

As a threshold matter, the court must therefore determine whether QPC is in fact engaged in the development, manufacture or marketing of products that directly or indirectly compete with those at BLI.  Attempting to distance its products from the allegedly inferior and less powerful laser goods manufactured by BLI, QPC vigorously disputes plaintiff's assertion that the two in fact compete.  On this issue I conclude that plaintiff has made a sufficient finding.  The evidence now before the court reflects at

least some degree of overlap in the customers of both BLI and QPC. Indeed, a purchase order initially given by Rafael to BLI for the development and purchase of a laser fiber connector product, but not accepted by BLI, was later filled by QPC.[10]  *See* Hearing Exhibit P-1. Even more telling is the fact that efforts by BLI in March of 2007 to purchase from QPC single emitter semi-conductor lasers were rebuffed by QPC in an e-mail from QPC's Director of Marketing, on the stated basis that "[b]ecause of the competitive nature of our business, we are not in a position to enable our *competitors* with our high spatial brightness products."  Meytahl Reply Aff. (Dkt. No. 14) Exh. A. (emphasis supplied).

With defendant Zu's violation of the restriction not to engage in any competitive business activity having been established, at least for purposes of this motion, the remaining pivotal issue bearing upon BLI's likelihood of success is the enforceability *vel non* of the restrictive covenant at issue.  Under New York law, analysis of the enforceability of a restrictive covenant such as that set forth in the governing BLI agreement is informed by the "modern, prevailing common law standard" that the

---

[10]      According to President and CEO Meytahl, BLI rejected the Rafael purchase order as a result of a business judgment that the transaction would not be sufficiently advantageous to BLI.

18

contract provision be "reasonable."  *BDO Seidman v. Hirshberg,* 93

N.Y.2d 382, 389, 690 N.Y.S.2d 854, 856-57 (1999).  "A restraint is

reasonable only if it: (1) is no greater than is required for the protection of

the legitimate interest of the employer, (2) does not impose undue

hardship on the employee, and (3) is not injurious to the public."  *Id.* at

388-89, 690 N.Y.S.2d at 856-57 (emphasis and citations omitted); *Reed,*

*Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d

677, 689 (1976).  To warrant enforcement, a restrictive covenant must be

reasonable, both in terms of time and geographical scope, and the

cumulative effects of both limiting factors must not unduly stifle

competition beyond those limitations which are necessary.  *See Business*

*Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1072-73 (S.D.N.Y.

1984); *see also Mixing Equip. Co., Inc. v. Philadelphia Gear, Inc.*, 436

F.2d 1308, 1314 (3d Cir. 1971*)* (applying New York Law); *Gelder Med.*

*Group v. Webber*, 41 N.Y.2d 680, 394 N.Y.S.2d 867, 871 (1977).  A

restrictive covenant will not be enforced, even though its literal language

may be facially reasonable, if its intended purpose is simply to hinder

competition, or in the event that coercion played a role in the employee's

decision to sign the contract.  *BDO Seidman*, 93 N.Y.2d at 391-92, 690

N.Y.S.2d at 859-61.  The party seeking to enforce a restrictive covenant

bears the burden of establishing that its provisions are reasonable.  *See*

*FTI Consulting, Inc. v. Graves*, No. 05 Civ. 6719, 2007 WL 2192200, at \*5-

6 (S.D.N.Y. July 31, 2007) (citing New York law).

      In this instance the restrictive covenant at issue purports to prohibit

defendant Zu from competing with BLI for a period of one year throughout

the United States.  Upon proper showings, other courts applying New York

law have upheld restrictive covenants which limit competition for a period

of one year.  *See Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 470-

71 (S.D.N.Y. 2001); *Innovative Networks, Inc. v. Satellite Airlines Ticketing

Centers, Inc.*, 871 F. Supp. 709, 728 (S.D.N.Y. 1995); *Ecolab Inc. v.

Paolo*, 753 F. Supp. 2d 1100, 1111 (E.D.N.Y. 1991).  Similarly, anti-

competitive agreements extending geographically throughout the United

States have, under appropriate circumstances, been approved.  *See

Natsource*, 151 F. Supp. 2d at 471-72; *Innovative Networks*, 871 F. Supp.

at 728.  A determination of whether the BLI agreement signed by

defendant Zu is similarly enforceable depends upon the particular

circumstances supporting the need for the agreement.  *See Business

Intelligence Servs.*, 580 F. Supp. at 1071.

An employer's interests in a restrictive covenant are considered reasonable and enforceable only "(1) to the extent necessary to prevent the disclosure or use of trade secrets or confidential information, or (2) where an employee's services are unique or extraordinary." *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 8 Misc. 3d 412, 416, 797 N.Y.S.2d 883, 886-87 (N.Y. County Sup. Ct. 2005) (citing *Reed, Roberts Assocs.*, 40 N.Y.2d at 308, 386 N.Y.S.2d at 680); *see also American Broadcasting Co., Inc. v. Wolf,* 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 486 (1981).   Addressing the second of those factors, the Second Circuit has observed that

> [i]n analyzing whether an employee's services are unique, the focus today is less on the uniqueness of the individual person of the employee . . . . [but is] more focused on the employee's relationship to the employer's business to ascertain whether his or her services and value to that operation may be said to be unique, special or extraordinary; that inquiry, because individual circumstances differ so widely, must of necessity be on a case-by-case basis.

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 65 (2d Cir. 1999).  Typical of the types of employees whose services may properly be regarded as falling into this category are "musicians, professional athletes, actors and the like." *Id.* at 70.  In this instance plaintiff has failed to establish that

defendant Zu's services at BLI fell within the category of "unique or

extraordinary."  To the contrary, the record discloses that most if not all of

defendant Zu's activities at both BLI and QPC fall comfortably within the

category of routine optical engineering functions, and there is no evidence

that in his position at BLI he gained expertise in such a highly technical

area, or developed such a specialized, extraordinary technical acumen, as

to elevate the significance of his skills to a level qualifying them as unique

or extraordinary.

Turning to the remaining prong of the reasonableness catechism,

addressing the extent of protection necessary in order to prevent misuse

of trade secrets or confidential information, BLI has made what could fairly

be characterized as only a modest showing, at best.  Plaintiff did relatively

little, either in its papers or during the evidentiary hearing, to carry its

burden of proving necessity for the restrictions at issue, and hence their

reasonableness.  At the hearing, BLI President and CEO Meytahl was

unable to articulate a reason for requiring BLI employees to sign a

restrictive covenant and the need to extend it for a period of one year, and

geographically throughout the United States.  The impression given by the

witness was that he was unfamiliar with the precise circumstances

surrounding the drafting of the restriction, although it appears to have

22

been largely if not wholly borrowed from an agreement utilized by Polaroid prior to BLI's acquisition of its laser division.

Despite BLI's lack of emphasis in its papers, and at the hearing, on the reasonableness component of the inquiry, at trial BLI may ultimately be able, at least circumstantially, to substantiate the reasonableness of the disputed covenant, both in terms of time and geographical scope. Intuitively, based upon the nature of the business and the technology involved, one might anticipate the need for such protections.  The industry involved appears to include only a relatively small number of competitors, selling products to a common group of defense contractors and other potential users of laser technology.  While the evidence is somewhat ambiguous on this score, it appears that during the time it operated a laser division Polaroid used a similar agreement, prohibiting both the use of confidential information and restricting competition.  All BLI employees, according to the testimony of company President and CEO Meytahl, are required to sign such an agreement.  Similarly, employees at QPC, while not made to agree to any employment restriction following termination of their employment with the company, are required to sign agreements restricting their use of confidential information acquired during the period

of their employment.[11]

In light of the nature of the relief now sought, however, BLI bears a heavy burden, requiring it to make a "clear" or "substantial" showing of likelihood of success on the merits in order to qualify for a preliminary injunction.  *See New York Magazine*, 136 F.3d at 127; *Jolly*, 76 F.3d at 473; *Tom Doherty Assoc.,* 60 F.3d at 34.  Based upon the equivocal nature of the evidence now before the court on this score, a strong showing of likelihood of success on the merits on the part of BLI has not been established; while BLI may ultimately prevail at trial on its claims against defendant Zu, it has failed to set forth an adequate showing regarding the reasonableness of the employment restrictions set forth in Zu's employment agreement.  Accordingly, I conclude that plaintiff has not sufficiently demonstrated a likelihood of success on the merits of its breach of contract claims in this action to justify the issuance of a preliminary injunction.

C.    Irreparable Harm

The primary function to be served by the issuance of a preliminary

---

[11]    While acknowledging that in any event such a provision would be void under California Law, as against public policy, Unger gratuitously offered that even if it were not he nonetheless would not require QPC employees to agree to such a restriction.

injunction is the avoidance of an injury or harm for which damages cannot adequately compensate the moving party.  *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 952-53 (1974); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917-18 (2d Cir. 1986).  Consequently, the lynchpin factor in the preliminary injunction calculus is the issue of irreparable harm; since the issuance of a preliminary injunction represents extraordinary relief, awarded before full litigation of an action on its merits, it should be granted only in the event that the moving party establishes that if interim relief is not granted, it will suffer irreparable harm which cannot adequately be redressed by invoking legal remedies.  *See Ticor Title Ins. Co.*, 173 F.3d at 68.

"Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  *Tom Doherty Assocs.*, 60 F.3d at 37 (internal quotations and citation omitted); *see also N.A.A.C.P.,* 70 F.3d at 224 ("A moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages.") (citing *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir. 1989)); *Johnson Controls, Inc. v.*

*A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004).  A

showing of irreparable harm is the "single most important prerequisite for

the issuance of a preliminary injunction."  *Cortland Line Co., Inc. v.*

*Vincent*, No. 98-CV-259, 1998 WL 542332, at *3 (N.D.N.Y. Aug. 18, 1998)

(Munson, S.J.) (citing *Bell & Howell: Mamiya Co. Corp. v. Masel Supply*

*Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)) (internal quotations omitted);

*see Johnson Controls*, 323 F. Supp. 2d at 531 (citing, *inter alia*, *Bell &*

*Morrow*).

       As irreparable harm, plaintiff offers the potential for defendant Zu to

disclose, and utilize in connection with his employment at QPC,

confidential, proprietary information obtained during the course of his

employment at BLI.  While conceding an unawareness of whether Zu is

actually utilizing proprietary information allegedly belonging to BLI in his

position at QPC and sharing it with others within the company, BLI

speculates that this is in fact occurring and will continue absent issuance

of the requested injunction.[12]

---

       [12]      BLI essentially asserts that irreparable harm will ensue based on Zu's
inevitable disclosure of its trade secrets during the course of his work for QPC.  The
doctrine of inevitable disclosure is rooted in the fact that "once employees have
knowledge of a competitor's confidential information, it is almost impossible to
compartmentalize that knowledge and avoid using it when they go to work on a similar
job in the same industry."  *Colonize.com, Inc. v. Perlow*, No. 03-CV-466, 2003 WL
24256576, at *5-6 (N.D.N.Y. Oct. 23, 2003) (Munson, S.J.).  This doctrine, however, is

A trade secret is something more than merely information, though perhaps unique in some degree to a particular business entity, regarding such matters as production, customer development and relationships, pricing, and other similar matters.  The type of information and materials entitled to protection as trade secrets includes "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'"  *See Norbrook Lab. Ltd.*, 297 F. Supp. 2d at 482-83  (quoting *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F. 3d 955, 968 (2d Cir. 1997)); *see also Carpetmaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.*, 12 F. Supp. 2d 257, 261 (N.D.N.Y. 1998) (McAvoy, C.J.).  When attempting to discern whether information merits trade secret status, courts generally look to

disfavored in New York as a basis for an irreparable harm finding, based primarily on this State's strong public policy against restrictive non-competition agreements. *Id.* at *6.  As observed by Senior District Judge Munson, federal courts also have exemplified a reluctance to use the doctrine to grant injunctive relief, *see Earthweb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999), *aff'd*, 2000 WL 1093320 (2d Cir. May 18, 2000) ("[I]n its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory."), and have applied the doctrine only where other evidence of actual misappropriation of trade secrets exists. *Id.*; *see also Earthweb*, 71 F. Supp. 2d at 310.  BLI's claim that Zu undoubtedly will reveal its proprietary information during his employment at QPC, without more, therefore is insufficient to constitute the irreparable harm necessary for the issuance of a preliminary injunction. *Colonize.com*, 2003 WL 24256576, at *6 ("[M]ere knowledge of the intricacies of a business is simply not enough.") (citations omitted).

several potentially relevant factors, including

> (1) the extent to which the information is known
> outside of [the company's] business; (2) the extent
> to which it is known by employees and others
> involved in [the company's] business; (3) the extent
> of measures taken by [the company] to guard the
> secrecy of the information; (4) the value of the
> information to [the company] and to [its]
> competitors; (5) the amount of effort or money
> expended by [the company] in developing the
> information; (6) the ease or difficulty with which the
> information could be properly acquired or
> duplicated by others.

*Carpetmaster of Latham,* 12 F. Supp. 2d at 261 (citing *Integrated Cash*

*Mgmt. Servs. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.

1990)).

Despite the extent of BLI's submissions and an evidentiary hearing

at which it was afforded a full opportunity to present its case, BLI has

failed to articulate with any degree of specificity the confidential,

proprietary trade secret information to which Zu purportedly was exposed

during his employment there, other than in purely conclusory terms.[13]

---

[13]   Significantly, despite the fact that confidential and proprietary information
is allegedly at stake in the action, and particulars regarding BLI's business operation
have been the subject of extensive evidentiary submissions and testimony freely given
by the company's President and CEO in open court, in the presence of Zu and QPC's
President and CEO, no protective order has been issued in this case pursuant to Rule
26(c) of the Federal Rules of Civil Procedure, nor has BLI either requested one or
taken other measures to preserve the integrity of its allegedly confidential information
disgorged in support of its motion.

Conspicuously lacking in the record now before the court are any specifics concerning BLI information which could truly be considered as proprietary and highly confidential and which, the evidence discloses, was treated as such by the company.  The identities of potential customers for those laser product manufacturers within the industry, including QPC and BLI, appear to be well-known. Similarly, the evidence reveals that pricing information regarding its laser products has not been maintained by BLI with any degree of secrecy.  While BLI's President and CEO Meytahl asserts, in a vague way, that while employed by the company Zu was exposed to information related to product design and manufacturing processes, described as "cutting edge technology", no specifics have been offered, and indeed it appears that the specifications associated with many of BLI's products are publically available on its web site.[14]  *See*, *e.g.*, Hearing Exhibits D-2 through D-5.

In support of its claim of exposure to irreparable harm under the

---

[14]     Examples of the striking generalities offered regarding BLI's allegedly proprietary information accessible to Zu during his employment there are found in affidavits submitted by BLI's President and CEO, Ahron Meytahl.  *See, e.g.*, Meytahl Aff. (Dkt. No. 1) ¶ 12 (at BLI, Zu "was given access to detailed information about other BLI products, including fiber coupled lasers, and other cutting edge technology developed by, and improved upon, by BLI"); Meytahl Reply Aff. (Dkt. No. 14) ¶ 21 ("the point is that Zu had, and has, a great deal of confidential information obtained during his years with BLI, including but not limited to manufacturing techniques").

circumstances, BLI offers the fact that while at BLI, defendant Zu was permitted to attend weekly production meetings of high level staff within the company.  A review of sample minutes derived from those meetings, however, fails to substantiate that truly confidential proprietary information was discussed during those sessions.  *See, e.g.*, Hearing Exhibit P-1. Significantly, those meeting minutes bear no legend indicating that they are confidential, and BLI concededly takes no meaningful measures to protect their integrity.  Indeed, President and CEO Meytahl readily acknowledged that minimal steps are taken to protect the confidentiality of any information of BLI, and that while efforts are made to reduce the availability of hard copies of certain documents, the computer network on which such matters are digitally stored is generally not even password protected beyond the log-in process.

Although it was somewhat difficult to discern from the testimony of BLI President and CEO Meytahl and defendant Zu what precisely Zu did at BLI, it appears that his function at QPC is similar to that which he performed at BLI.  Undeniably, as a BLI employee, defendant Zu gained knowledge and experience in the field of laser technology and the production processes associated with laser fiber coupling, and is now undoubtedly utilizing that acquired skill and knowledge at QPC.  The law,

30

however, does not restrict an employee from utilizing such skills gleaned

from one employer when going to work from another, potentially

competing firm; under New York law, while restrictive covenants may

properly prohibit an employee from utilizing truly confidential and

proprietary information acquired from an employer, such an agreement

may not restrict the use of general, non-confidential knowledge and

techniques acquired in the workplace.  *See Johnson Controls*, 323 F.

Supp. 2d at 533 ("[A]n employee's knowledge of the intricacies of [a

former employer's] business operation is not a protectable interest

sufficient to justify enjoining the employee from utilizing his knowledge and

talents.") (internal quotations and citations omitted); *see also Silipos, Inc.*

*v. Bickel*, No. 06-cv-02205, 2006 WL 2265055, at *3 (S.D.N.Y. Aug. 8,

2006) ("Mere knowledge of the intricacies of a business operation does

not qualify [as a trade secret].") (internal quotations omitted).

       In addition to failing to offer any specifics regarding product

specifications, production techniques, pricing information, or customer

identities which, the evidence now before the court substantiates, was

truly trade secret, the evidence fails to establish that BLI took any

measures to protect and preserve the confidentiality of the alleged

proprietary information, as required under New York law in order to

31

establish the existence of protectable trade secrets.  *See Jay's Custom Stringing, Inc. v. Yu*, No. 01 CIV. 1690, 2001 WL 761067, at *5 (S.D.N.Y. July 6, 2001) (noting that under New York law, the extent of the measures undertaken by the business to protect the secrecy of the information is a factor considered in determining whether information constitutes a trade secret).  While BLI asserts in a general sense that defendant Zu maintained and undoubtedly has utilized at QPC his intimate knowledge of BLI's business operations and that they constituted trade secrets and confidential information, such bald assertions, without more, simply do not suffice to establish the existence of trade secrets.  *See Kanan, Corbin, Schupak & Aronow,* 8 Misc.3d at 416, 797 N.Y.S.2d at 887 (former company vice president's use of a publically acquirable client contact list and alleged "intimate knowledge" of the company's business operations did not constitute trade secrets or confidential information).

    In an effort to create the specter of a misappropriation by defendant Zu of genuinely proprietary BLI trade secrets, plaintiff has submitted an affidavit from Morris Atwell, a Logistics Supervisor at BLI.  Dkt. No. 16.  In his affidavit, Atwell recites his observation that when Zu left for his vacation in June of 2007, he took with him "a binder with the technical specification and requirements for BLI laser units."  *Id.* ¶¶ 2-3.

Unfortunately, however, Atwell did not testify during the preliminary

injunction hearing, and BLI has provided no further elaboration as to the

contents of the binder, and particularly whether it merely contained

specifications of the type set forth in BLI's public web site, *see*, *e.g.*,

Hearing Exhibits D2-D5, or instead disclosed truly trade secret information

not known of outside of BLI.[15]

    In support of their claim that absent the injunctive relief now sought it

will suffer irreparable harm, BLI also cites the provision in its agreement

within which Zu acknowledges that in the event of a breach BLI will be

entitled to an injunction.  *See* Agreement § 8.  Without question, this

provision is not lacking in legal significance, given the observation by the

Court of Appeals for the Second Circuit to the effect that similar language

in an employment agreement "might arguably be viewed as an admission

by [the employee] that plaintiff will suffer irreparable harm were [the

employee] to breach the contract's non-compete agreement."  *Ticor Title*

*Ins. Co.*, 173 F.3d at 69 (considering several factors creating irreparable

harm in affirming district court's issuance of permanent injunction); *see*

---

    [15]    In response to this accusation, defendants assert that the binders taken
by Zu upon his departure contain non-proprietary information, and have offered what
they represent as those contents into evidence to substantiate that assertion.  *See*
Hearing Exhibits D-7 and D-8.

*also North Atlantic Instruments*, 188 F.3d at 49 (finding that language in employment agreement stating that breach of confidentiality clause would cause "irreparable injury" to employer was some evidence, although not conclusive evidence, of irreparable harm).  Such a contract provision, however, is not alone dispositive of the issue of irreparable harm, and does not insulate a plaintiff seeking a preliminary injunction from the need to prove that it will suffer imminent irreparable injury as a result of the employee's conduct.  *See Int'l Creative Mgmt.*, 2007 WL 950092, at *6-7 ("This Court is aware of no authority indicating that such a contract provision entitles the plaintiff to a *per se* finding of irreparable harm."); *Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp.*, No. 02 CV 10237, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) ("[A] contractual stipulation to the effect that irreparable harm exists is not itself dispositive . . . ."); *see also Baker's Aid*, 830 F.2d at 16 ("We also agree with the district court that the contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary relief is appropriate.").  Despite the existence of such a contract provision, a court must engage in the usual case-by-case analysis to determine whether an employer confronts imminent irreparable harm warranting the issuance of a preliminary injunction under

the circumstances now presented.  *See Int'l Creative Mgmt.*, 2007 WL 950092, at *7.

In sum, because plaintiff has failed to establish the existence of trade secrets regarded as such by BLI and accessible to defendant Zu during his employment there, or with the likelihood that if permitted to maintain his employment at QPC he will reveal those trade secrets and utilize them to the competitive disadvantage of BLI, I recommend that the court find plaintiff has failed to establish that it will suffer irreparable harm absent the issuance of a preliminary injunction.[16]

IV.    SUMMARY AND RECOMMENDATION

While undeniably the ability of a former employee to earn a livelihood by engaging in his or her chosen profession must yield under appropriate circumstances to the need to protect legitimate interests of an employer, *see Karpinski v. Ingrasci*, 28 N.Y. 2d 45, 49, 320 N.Y.S. 2d 1, 4 (1971), in this instance the plaintiff was unable to establish both a

---

[16]    My recommendation in this matter does not hinge upon the veracity of defendant Zu or his testimony, which I did not find to be wholly credible.  Rather, it is based upon the failure of plaintiff BLI to meet its heavy burden of proving Zu's exposure to trade secret, proprietary, and confidential information, as distinct from publically available information or unprotectable skills and techniques developed by Zu during the course of his employment at BLI.

legitimate need for protection and that absent an immediate injunction restraining Zu from continuing his employment at QPC, BLI will experience irreparable harm.  While BLI may ultimately prevail at a trial on the merits of its breach of contract allegation against defendant Zu, the equivocal record before the court on this issue fails to clearly or substantially support plaintiff's claim of likely success on the merits to the degree necessary to warrant preliminary injunctive relief.  The evidence now before the court further fails to substantiate that unless injunctive relief is granted BLI will suffer irreparable harm for which no adequate remedy at law exists.  Under these circumstances, I conclude that plaintiff has not demonstrated proper basis for this court to invoke its equitable powers and grant the preliminary injunction now sought.

RECOMMENDED, that plaintiff's motion for a preliminary injunction (Dkt. No. 6) be DENIED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of

this report and recommendation upon the parties in accordance with this

court's local rules.


Dated:      September 21, 2007
            Syracuse, NY


_____
David E. Peebles
U.S. Magistrate Judge